

08 CV 6775

BLANK ROME LLP
Attorneys for Plaintiff
Jeremy J.O. Harwood (JH 9012)
405 Lexington Avenue
The Chrysler Building
New York, NY 10174
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



RECEIVE
JUL 29 2008
U.S.D.C. S.D. N.Y.
CASHIERS

SAMSUN LOGIX HELLAS LTD.,

        Plaintiff,

        v.

VENUS INTERNATIONAL,

        Defendant.

08 Civ.

**VERIFIED COMPLAINT**

Plaintiff SAMSUN LOGIX HELLAS LTD. ("Plaintiff"), by its attorneys Blank Rome LLP, complaining of the above-named Defendant VENUS INTERNATIONAL ("Defendant"), as Owner of the M/V IOANNA P ("Vessel"), alleges upon information and belief as follows:

1.     This is a case of admiralty and maritime jurisdiction, as hereinafter more fully appears, and is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. The Court has subject matter jurisdiction. The action is also filed pursuant to 9 U.S.C. § 8.

2.     At all material times, Plaintiff was and now is a foreign company organized and existing under the laws of Greece.

3.     At all material times, Defendant was and now is a corporation organized and existing under the laws of Egypt.

## THE BASIC FACTS

### A.   THE "IOANNA P" CHARTER

4.     Plaintiff, as disponent or chartered owner of the M/V IOANNA P (the "Vessel") entered into a contract of charterparty dated on or about March 20, 2008 (the "IOANNA Charter") with Defendant, as Charterer.  A true copy is Exhibit 1 to the accompanying Rule B affidavit ("Rule B Aff.").

5.     Defendant, pursuant to an "invoice" dated on or about July 14, 2008 (Rule B Aff. Ex. 2) unilaterally and in breach of the IOANNA Charter has deducted purported "carrying charges" with interest in the total sum of $252,143.47 from earned freight.

6.     Plaintiff disputes its liability to pay carrying charges.  Rule B Aff. Ex. 3.  It has or will shortly initiate arbitration in London in respect thereto as required by the Charter.

7.     Defendant in further breach of the IOANNA Charter, has deducted unilaterally from earned freight "overage premium" in the sum of $150,224 pursuant to an invoice dated on or about July 1, 2008.  (Rule B Aff. Ex. 4).

8.     Plaintiff disputes the propriety of this unsupported deduction.  (Rule B Aff. Ex. 3).  It has or will shortly initiate arbitration in London in respect thereto, as required by the IOANNA Charter.

## THE "KONAVLE" CHARTER

9.     Plaintiff as disponent or chartered owner of the M/V KONAVLE entered into a contract of charterparty dated on or about March 21, 2008 with Defendant, as charterer (the "KONAVLE Charter").

10.    Defendant, pursuant to an invoice dated July 1, 2008 has unilaterally and in breach of the KONAVLE Charter deducted "overage premium" in the sum of $149,657 from earned freight. Rule B Aff. Ex. 5.

11.    Plaintiff disputes the propriety of this unsupported deduction. (Rule B Aff. Ex. 3). It has or will shortly initiate arbitration in London in respect thereto, as required by the KONAVLE Charter.

12.    This action is expressly filed without prejudice to Plaintiff's right of arbitration.

## COUNT I

## RULE B RELIEF

13.    Plaintiff repeats paragraphs 1 through 12 as if fully set forth herein.

14.    Plaintiff seeks issuance of process of maritime attachment so that it may obtain security for its claims including its English attorneys' fees and arbitrators' fees which are routinely awarded in London arbitration and no security for Plaintiff's claim has been posted by Defendant or anyone acting on its behalf to date.

15.    At best as can now be estimated, Plaintiff expects to recover the following amounts in the arbitration:

| A. | On the principal claim | $552,024 |
|---|---|---|
| B. | Estimated Recoverable English Lawyers and Arbitrators' Fees & "Costs" | $ 60,000 |
| C. | Interest over the course of 3 years at prime rate average of 8% per annum: | $132,485 |
| | **TOTAL**: | $744,509 |

16.    Defendant cannot be found within this district within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Rule B"), but is believed to have, or will have during the pendency of this action, assets in this jurisdiction.

**WHEREFORE**, Plaintiff prays:

A.    That process in due form of law issue against Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B.    That since Defendant cannot be found within this District pursuant to Rule B, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B attaching all of Defendant's tangible or intangible property or any other funds held by any garnishee, which are due and owing to Defendant up to the amount of $744,509 to secure the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and, pursuant to Rule B, answer the matters alleged in the Verified Complaint;

C.    That this Court retain jurisdiction over this matter through the entry of a judgment or award associated with the pending claims including appeals thereof.

D.    That Plaintiff may have such other, further and different relief as may be just and proper.

Dated: New York, NY
       July 29, 2008

Respectfully submitted,
BLANK ROME LLP
Attorneys for Plaintiff

By _____
Jeremy J.O. Harwood (JH 9012)
405 Lexington Avenue
New York, NY 10174
Tel.: (212) 885-5000

## **VERIFICATION**

STATE OF NEW YORK          )
                                                  : ss.:
COUNTY OF NEW YORK      )

Jeremy J.O. Harwood, being duly sworn, deposes and says:

1.        I am a member of the bar of this Honorable Court and of the firm of Blank Rome LLP, attorneys for Plaintiff.

2.        I have read the foregoing Complaint and I believe the contents thereof are true.

3.        The reason this Verification is made by deponent and not by Plaintiff is that Plaintiff is a foreign corporation, no officer or director of which is within this jurisdiction.

4.        The sources of my information and belief are documents provided to me and statements made to me by representatives of Plaintiff.

_____
Jeremy J.O. Harwood

Sworn to before me this
29th day of July, 2008

_____
Notary Public

LESCENE GIBBONS
Notary Public, State of New York
No. 01GI6044509
Qualified in New York County
Commission Expires July 10, 20 __

BLANK ROME LLP
Attorneys for Plaintiff
Jeremy J.O. Harwood (JH 9012)
405 Lexington Avenue
The Chrysler Building
New York, NY 10174
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SAMSUN LOGIX HELLAS LTD.,

        Plaintiff,

        v.

VENUS INTERNATIONAL,

        Defendant.

08 Civ.

**AFFIDAVIT UNDER
SUPPLEMENTAL RULE B**

---

STATE OF NEW YORK    )
                      : ss.:
COUNTY OF NEW YORK  )

    JEREMY J.O. HARWOOD, being duly sworn, deposes and says:

    1.    I am a member of the Bar of this Honorable Court and a member of the firm of Blank Rome LLP, attorneys for the Plaintiff herein. I am familiar with the circumstances of the complaint and submit this affidavit in support of Plaintiff's request for the issuance of process of maritime attachment and garnishment of the property of defendant VENUS INTERNATIONAL, as Owner of the M/V IOANNA P, a company organized and existing under the laws of the Marshall Islands, pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

2.     The defendant is not incorporated or registered to do business in this State.

3.     Under my supervision, my office did a search of the New York State Secretary of State, Division of Corporations, Transportation Tickler (2008 edition), telephone assistance in New York City, and the internet Yellow Pages.

4.     In our search, we did not find any listing or reference to defendant in this district or state.

5.     In the circumstances, I believe the defendant cannot be "found" within this district.

6.     I attach as Exhibit 1 hereto a true copy of the IOANNA Charter.

7.     I attach as Exhibit 2 hereto a true copy of Defendant's invoice dated July 14, 2008.

8.     I attach as Exhibit 3 hereto a true copy of Plaintiff's protest letter to Defendant.

9.     I attach as Exhibit 4 hereto a true copy of Defendant's invoice dated July 1, 2008.

10.     I attach as Exhibit 5 hereto a true copy of Defendant's invoice dated July 1, 2008.

Jeremy J.O. Harwood

Sworn to before me this
29th day of July, 2008

Notary Public

LESCENE GIBBONS
Notary Public, State of New York
No. 01GI6044509
Qualified in New York County
Commission Expires July 10, 20 16

2

# EXHIBIT 1

Code Name: **Norgrain 89**

RECOMMENDED BY:
THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)
THE FEDERATION OF NATIONAL ASSOCIATIONS OF SHIP BROKERS AND
AGENTS (FONASBA)

AMENDED MAY 1989



# NORTH AMERICAN GRAIN CHARTERPARTY 1973

ISSUED BY THE ASSOCIATION OF SHIP BROKERS AND AGENTS (U.S.A.) INC.

ALEXANDRIA ON 20TH MARCH 2008.                                49

| | |
|---|---|
| Classification | IT IS THIS DAY MUTUALLY AGREED, between  **SAMSUN LOGIX HELLAS LTD.,11 nafsikas road voula Greece 16673.** | 1 |

Owners/Disponent Owners/Time-chartered-Owners/Chartered-Owners of the        (SS/M.V.) (Self/Non Self Trimming Bulk Carrier/Tween Decker/Tanker)        Call Sign

*(Line 2: Delete as appropriate)* **(SEE CLAUSE 52)**

**Description**
**of Vessel**

Built        at        of        tons of £2,240 lbs.

deadweight all told, or thereabouts, and with a grain cubic capacity available for cargo of        cubic feet (including        cubic feet in

self/electing-wing spaces) **M/V IOANNA P (SEE CLAUSE 52).**

Classed _____/ highest lloyds register or equivalent
in _____ now **trading**

*(Lines 7-10: Insert vessel's itinerary.)*

**Charterers**
and        of        Charterers. **VENUS INTERNATIONAL, FREE ZONE FOR GRAIN TRADING AND MARINE SERVICES,**
**14 RAMO TOWER EL NASR ROAD, NASR CITY CAIRO, EGYPT** As Charterers.

**Loading**
**Port(s)**

1. That the said vessel, being tight, staunch strong and in every way fit for the voyage, shall with all convenient speed proceed to **one safe berth one safe port NORFOLK.**

at        safe-loading-berth(s)-in-Charterers'-option;        and there load

**Description**
**of Cargo**
always afloat, a-full-and-complete-*/part* cargo in bulk of one shipment as follows; 55,000 mts +/- 5% in oo bulk wheat sf 46 cbf / mt wog.Cargo to be loaded under master supervision,

at Charterers' option        tons of 2,240 lbs. /-1,000 kilos.*        % more-or-less-quantity-at-Owners'-option;

/Venus international / Shippers / Load port agents.        "telex number: **10,7,5,3,2,1 days notice of arrival at loading port.**

**Notice and**
**Loading Port**
2. Owners are to give Charterers (or-their-Agents) (telegraphic-address)        % more-or-less-quantity-of-cargo-required-with-the-15-days'-notice;-such-quantity-to-be-based-on-a-cargo-of-Heavy-Grain,-unless-the

15-and-7-days-notice-of-vessel's-expected-readiness-to-load-date;-and-approximate-quantity-of-cargo-required-with-the-15-days'-notice;-such-quantity-to-be-based-on-a-cargo-of-Heavy-Grain,-unless-the

*/ Delete as appropriate.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

ORIGINAL

cargo composition has been declared or indicated.

The Charterers are to be kept continuously advised by telegram/telex of any alteration in vessel's readiness to load date.

Master to apply to (telegraphic address:" _____ )

~~for first -or -sole -loading -port -orders -144 -hours -before -vessel's -expected -readiness -to -load -date -but -not -sooner -than -144 -hours -before -the -laydays -in -Clause -4 -and -Charterers -or -their -Agents -are -to -give~~ orders for first or sole loading port within 72 hours of receipt of Master's application, unless given earlier.

Orders for second port of loading, if used, to be given to the Master not later than

Master is to give Charterers (or their agents) 72, 48, 24 hours notice of vessel's estimated time of arrival at first or sole loading port together with vessel's estimated readiness to load date. **(SEE CLAUSE 50)**

**n.o.r. cannot be tendered prior commencement of laydays.**

Vessel is to load under inspection of National Cargo Bureau, Inc in U.S.A ~~ports -or -of -the -Port -Warden -in -Canadian -ports.~~ Vessel is also to load under inspection of a Grain Inspector licensed/authorised by the United States Department of Agriculture pursuant to the U.S. Grain Standards Act ~~and/or -of -a -Grain -Inspector -employed -by -the -Canada -Department -of -Agriculture -as -required -by -the -appropriate authorities.~~

~~If vessel heads at other than U.S. or Canadian ports, she is to load under inspection of such national and/or regulatory bodies as may be required.~~

Vessel is to comply with the rules of such authorities, and shall load cargo not exceeding what she can reasonably stow and carry over and above her Cabin, Tackle, Apparel, Provisions, Fuel, Furniture and Water. Cost of such inspections shall be borne by Owners.

4. Laytime for loading, if required by Charterers, not to commence before 0800 on the [0001] day of [2400] day of 19 **20TH JUNE 2008.**

Should the vessel's notice of readiness not be tendered and accepted as per Clause 18 before 1200 on the ____ day of 19 **30TH JUNE 2008.** the Charterers have the option of cancelling this Charterparty any time thereafter, but not later than one hour after the tender of notice of readiness as per Clause 18.

5. On being so loaded, the vessel shall proceed to **1/2 SB 1 SP Egyptian Med where maximum draft 42 ft.** as ordered by Charterers/Receivers*, and deliver the cargo, according to Bills of Lading at **1/2** safe discharging berths in Charterers' option, vessel being always afloat, on being/having been* paid freight as per Clauses 8 and 9. **Discharge port to be declared upon passing Gibraltar.**

**time used before commencement of laytime not to count.**

Master to apply to (telegraphic address:" _____ )

for first or sole discharging port orders 96 hours before vessel is due off/at* and they are to give first or sole discharging port orders by radio within 48 hours of receipt of Master's application unless given earlier -if -Master's -application -is -received -on -a -Saturday, -the -time -allowed -shall -be -52 -hours -instead -of -48 -hours.

* Delete as appropriate.

21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44

ORIGINAL

Orders for second and/or third port(s) of discharge are to be given to the Master not later than vessel's arrival at first or subsequent port. [45]

Master to radio Charterers/Receivers (or their Agents) 72 and 24 hours notice of vessel's estimated time of arrival at first or sole discharging port. Charterers/Receivers (or their Agents) are to be kept [46]
continuously advised by radio/telegram/telex of any alterations in such estimated time of arrival. [47]

| based on shore / elevator figures. |

6. The Master is to sign Bills of Lading as presented on the North American Grain Bill of Lading form without prejudice to the terms, conditions and exceptions of this Charterparty. If the Master elects [48]
to delegate the signing of Bills of Lading to his Agents he shall give them authority to do so in writing, copy of which is to be furnished to Charterers if so required. [49]

| on agents form |

7. Rotation of loading ports is to be in Owners'*/Charterers'* option. [50]

Rotation of discharging ports is to be in Owners'*/Charterers'* option, but if more than two (2) ports of discharge are used rotation is to be geographic [51]
(95%) of the freight.    to [52]

8. Freight to be paid as follows: **US $ 58.50  (FIFTY EIGHT U.S DOLLARS AND FIFTY CENTS) F.I.O.S.T**

**Per ton free in out for wheat shipment of basis 55,000 mts +/- 5% bulk wheat in owners option to be paid within three (3) banking days after signing / releasing [53]
original bills of lading marked "freight payable as per charter party" and presentation of original signed and stamped charter party by owners together with [54]
original freight invoice and copy of issued bills of lading.Balance of 5% of freight to be settled with demurrage / despatch calculations within maximum period of [55]
21 days after receipt of laytime calculations and supported documents signed by either parties.** [56]

~~per ton of 2,240 lbs./1,000 Kilos*~~ [57]

| The original charter party together with the addendum declaring the vessel's name to be in charterers hand signed by owners minimum 10 days prior vessel's arrival load port. | [57]

~~Charterers have the option of ordering the vessel to load at~~ [58]

~~in which case the rate of freight to be~~ [59]

~~per ton of 2,240 lbs./1,000 Kilos*~~ [60]

~~Charterers/Receivers have the option of ordering the vessel to discharge at~~ [63]

~~in which case the rate of freight to be~~ [64]

~~per ton of 2,240 lbs./1,000 Kilos*~~ [66]

* Delete as appropriate.

ORIGINAL

If more than one port of loading and/or discharging is used, the rate of freight shall be increased by

port-to-port of £2.240 lbs/1.000 Kilos* for each additional loading and/or discharging port on the entire cargo

9.   (a)   Freight shall be fully prepaid on surrender of signed bills of lading in      in us dollars currency to    " see clause 58"

on Bill of Lading weight, discountless, not returnable, vessel and/or cargo lost or not lost. Freight shall be deemed earned as cargo is loaded on board.

Once the Bills of Lading have been signed, and Charterers call for surrender of Original Bills of Lading against freight payment above, it will be incumbent upon Owners or their Agents to comply immediately with such call for surrender during office hours, Mondays to Fridays inclusive.

  (b)

10.   (a)*   Cargo is to be loaded and spout trimmed (to Master's satisfaction in respect of seaworthiness) free of expense to the vessel.
           Cargo is to be discharged free of expense to the vessel (to Master's satisfaction in respect of seaworthiness).

**Any additional trimming required over and above spout trimming to be at owner's time, risk and expense.**

  (b)*   Cargo is to be loaded and trimmed at Owners' expense.
           Cargo is to be discharged free of expense to the vessel (to Master's satisfaction in respect of seaworthiness).

11. Stevedores at loading port(s) are to be appointed by Charterers*/Owners* and paid for by Charterers*/Owners

If stevedores are appointed by Owners, they are to be approved by Charterers at loading port(s), and such approval is not to be unreasonably withheld. Stevedores at discharging port(s) are to be appointed and paid for by Charterers/Receivers*.

In all cases, stevedores shall be deemed to be the servants of the Owners and shall work under the supervision of the Master.

12.   (a)   The vessel is warranted to be a self-trimming bulk carrier.*/non-self-trimming bulk carrier.* **single decker**

\* Delete as appropriate.

ORIGINAL

**(b)** Cargo may be loaded into wing spaces if the cargo can bleed into centerholds. Wing spaces are to be spout trimmed any further trimming in wing spaces and any additional expenses in discharging are to be for Owners' account, and additional time so used is not to count as laytime or time on demurrage. 91–92

**13.** **(a)** **Expenses** 93
(i) All overtime expenses at loading and discharging ports shall be for account of the party ordering same. 94
(ii) If overtime is ordered by port authorities or the party controlling the loading and/or discharging terminal or facility all overtime expenses are to be equally shared between the Owners and Charterers'/Receivers' **TO BE FOR CHARTERERS ACCOUNT.** 95–96
(iii) Overtime expenses for vessel's officers and crew shall always be for Owner's account. 97

**(b)** **Time Counting** 98

If overtime ordered by Owners be worked during periods excepted from laytime the actual time used shall count; if ordered by Charterers/Receivers, the actual time used shall not count; if ordered by port authorities or the party controlling the loading and/or discharging terminal or facility half the actual time used shall not count. 99–100

**14.** Cost of cargo separations, including labor used for laying same, to be for Charterers' account unless required by Owners in which case all resultant expenses shall be borne by the Owners. Separations ordered by Charterers shall be made to Master's satisfaction (but not exceeding the requirements of the competent authorities). 101–102

**15.** **(a)** **For Owners' account** 103
Any securing required by Master, National Cargo Bureau or Port Warden for safe trim/stowage to be supplied by and paid for by Owners, and time so used not to count as laytime or time on demurrage. 104
Bleeding of bags, if any, at discharge port(s) to be at Owners' expense, and time actually lost is not to count. 105

**(b)** **For Charterers' account** 106
Any securing required by Master, National Cargo Bureau or Port Warden for safe trim/stowage to be supplied by and paid for by Charterers, and time so used to count as laytime or time on demurrage. 107
Bleeding of bags, if any, at discharge port(s) to be at Charterers'/Receivers' expense. 108

*(Delete para (a) or (b) as appropriate)*

**16.** ➤ *(see clause 46?)* If after loading has commenced and at any time thereafter until completion of discharge the cargo is required to be fumigated in vessel's holds, the Owners are to permit same to take place at Charterers' risk and expense, including necessary expenses for accommodating and victualling vessel's personnel ashore. 109–110

The Charterers warrant that the fumigants used will not expose the vessel's personnel to any health hazards whatsoever, and will comply with current IMO regulations. 111

Time lost to the vessel is to count at the demurrage rate. 112

* Delete as appropriate.

ORIGINAL

17. ~~(a)~~   Notice of Readiness See clause (80)

18. ~~(a)~~   At each loading and discharging port, cost of ~~first~~ opening and ~~last~~ closing of hatches and removal and replacing of beams, if any, shall be for Owners' account/Cost of all other opening and closing of hatches, removal and replacing of beams shall be for Charterers'/Receivers' account. **(SEE CLAUSE 50).**

**Both ends time for all opening and all closing hatches and draft surveyor not to count.**

18. ~~(a)~~   Notice of Readiness See clause (80)
~~Notification of vessel's readiness to load and discharge at the first or sole loading and discharging port shall be delivered in writing at the office of Charterers/Receivers between 0900 and 1700 on the days except Sundays and holidays and between 0900 and 1200 on Saturdays. Such notice of readiness shall be delivered when the vessel is at the loading or discharging berth if vacant, failing which from a lay-berth or anchorage within limits of the port, or otherwise as provided in Clause 18 (b) hereunder.~~

(b)   Waiting for Berth Outside Port Limits
If the vessel is prevented from entering the limits of the loading/discharging port(s) because the first or sole loading/discharging berth or a lay berth or anchorage is not available within the port limits, or on the order of the Charterers/Receivers or any competent official body or authority, and the Master warrants that the vessel is physically ready in all respects to load or discharge, the Master may tender vessel's notice of readiness, by radio if desired, from the usual anchorage outside the limits of the port, whether in free pratique or not, whether customs cleared or not. If after entering the limits of the loading port, vessel fails to pass inspections as per Clause 18 (e) any time so lost shall not count as laytime or time on demurrage from the time vessel fails inspection until she is passed, but if this delay in obtaining said passes exceeds 24 running hours then all time spent waiting outside the limits of the port shall not count.

(c)   Commencement of Laytime See clauses (77) and (80)
~~Following receipt of notice of readiness laytime will commence at 0800 on the next day not excepted from laytime. Time (not excepted from laytime) actually used before commencement of laytime shall count.~~

(d)   Subsequent Ports
~~At second or subsequent port(s) of loading and/or discharging, laytime or time on demurrage shall resume counting from vessel's arrival within the limits of the port or as provided in Clause 18 (b) if applicable.~~

(e)   Inspection
Unless the conditions of Clause 18 (b) apply, at first or sole loading port Master's notice of readiness shall be accompanied by pass of the National Cargo Bureau/Port Warden and Grain Inspector's certificate of vessel's readiness in all compartments to be loaded, for the entire cargo covered by the Charterparty as per Clause 3. ~~In the event that vessel loads in subsequent port(s) and is required to re-pass inspection in these ports, any time lost thereat in securing the required certificates shall not count as laytime or time on demurrage.~~ Time of all opening and all closing hatches and draft

**surveyor not to count at loading and discharging port.**

19.   ~~(a)~~   ~~Vessel is to be loaded and discharged within~~
**at the rate of**
~~working days of twenty-four (24) consecutive hours each (weather permitting),~~ **10,000 mts PWWD of 24 hours or pro rata, saturday**
~~Sundays and Holidays excepted.~~ **excluded EIU.**

(b)   ~~Vessel is to be loaded within~~
~~working days of twenty-four (24) consecutive hours each (weather permitting),~~ **8000 Mts PWWD FHEX EIU.**

(c)   Vessel is to be discharged at the average rate of
~~tons of 2,240 lbs*/1,000 kilos* per working day of twenty-four (24) consecutive hours~~ **8000 Mts PWWD FHEX EIU.**

* Delete as appropriate.

Page 6

ORIGINAL

(weather permitting). Sundays and Holidays excepted on the basis of the Bill of Lading weight **(see clause 80).**                                                                                          140

(d)   Notwithstanding any custom of the port to the contrary, Saturdays shall not count as laytime at loading and discharging port or ports where stevedoring labor and/or grain handling facilities   141
are unavailable on Saturdays or available only at overtime and/or premium rates.                                                                                                                         142

*(Delete para (a), (b) or (c) as appropriate)*

In ports where only part of Saturdays is affected by such conditions, as described above, laytime shall count until the expiration of the last straight time period.                                      143

Where six or more hours of work are performed at normal rates, Saturday shall count as a full lay day.                                                                                                    144

(e)   In the event that the vessel is waiting for loading or discharging berth, no laytime is to be deducted during such period for reasons of weather unless the vessel occupying the loading or          145
discharging berth in question is actually prevented from working grain due to weather conditions in which case time so lost is not to count.                                                              146

20.   Demurrage at loading and/or discharging ports is to be paid at the rate of _____ per day or pro rata for part of a **Dem. /DESP: USD 65,000 PDPR / HD**                                            147
day and shall be paid by Charterers in respect of loading port(s) and by Charterers/Receivers* in respect of discharging port(s). Despatch money to be paid by Owners at half the demurrage rate for all  148
laytime saved at loading and/or discharging ports.                                                                                                                                                       149

Any time lost for which Charterers/Receivers are responsible, which is not excepted under this Charterparty, shall count as laytime, until same has expired, thence time on demurrage.                     150

> **Demurrage or despatch to be settled within a maximum period of 21 days after receipt of laytime calculations and supported documents signed by either parties.**

21.   (a)   **Shifting expenses and time (see clause 56)**                                                                                                                                                151

(i)   Cost of shifting between loading berths and east of shifting between discharging berths including bunker fuel used to be for Owners*/Charterers/Receivers* account time                             152
counting.                                                                                                                                                                                               153

(ii)   If vessel is required to shift from one loading or discharging berth to a lay berth or anchorage due to subsequent loading or discharging berth(s) not being available, all such                   154
shifting expenses as defined above shall be for Owners*/Charterers*/Receivers* account, time counting.                                                                                                   155

(iii) If the vessel shifts from the anchorage or waiting place outside the port limits either directly to the first loading or discharging berth or to a lay berth or anchorage within the port           156
limits the cost of that shifting shall be for Owners' account and time so used shall not count even if vessel is on demurrage.                                                                            157

(iv)  Cost of shifting from lay berth or anchorage within the port limits to first loading or first discharging berth to be for Owners' account, time counting.                                           158

(b)   **Shifting in and out of the same berth**                                                                                                                                                          159
If vessel is required by Charterers/Receivers* to shift out of the loading berth or the discharging berth and back to the same berth, one berth shall be deemed to have                                   160
been used, but shifting expenses from and back to the loading or discharging berth so incurred shall be for Charterers/Receivers* account and laytime or time on demurrage shall count.                   161

(c)   Overtime expenses for vessel's officers and crew shall always be for Owners' account.                                                                                                              162

* Delete as appropriate.

Page 7

ORIGINAL

22. If required, the Master is to give free use of vessel's cargo gear including runners ropes and slings as on board, and power to operate the same. 163

Vessel's personnel is to operate the gear if permitted to do so by shore regulations, failing which shore operators are to be used. 164

Such shore operators are to be for Owners' account at loading port(s) if the provisions of Clause 10 (b) apply, otherwise for Charterers' account at loading and Charterers'/Receivers' account at 165
discharging port(s). 166

Time lost on account of breakdown of vessel's gear essential to the loading or discharging of this cargo is not to count as laytime or time on demurrage, and if Clause 10 (a) applies any stevedore 167
standby time charges incurred thereby shall be for Owners' account. 168

If required, Master shall give free use of the vessel's lighting as on board for night work. 169

23. If ordered to be loaded or discharged at two or more <del>ports</del> berths / anchorages, the vessel is to be left in seaworthy trim to Master's satisfaction (not exceeding the requirements of the Safety of Life at Sea Convention 170
as applied in the country in which such ports are situated) for the passage between <del>ports</del> berths / anchorages at Charterers' expense at loading and at Charterers'/Receivers' expense at discharging ports, and time used for 171
placing vessel in seaworthy trim shall count as laytime or time on demurrage. 172

24. Owner warrant the vessel's deepest salt water draft shall not exceed 42 ........ feet ........ inches on completion of loading and 173
on arrival at first or sole discharging port. 174

Should the vessel be ordered to discharge at a place in which there is not sufficient water for her to get the first tide after arrival without lightening, and lie always afloat, laytime is to count as per Clause 175
18 at a safe anchorage for similar vessels bound for such a place and any lighterage expenses incurred to enable her to reach the place of discharge is to be at the expense and risk of the cargo, any 176
custom of the port or place to the contrary notwithstanding, but time occupied in proceeding from the anchorage to the discharging berth is not to count as laytime or time on demurrage. 177

Unless loading and/or discharging ports are named in this Charterparty, the responsibility for providing safe port of loading and/or discharging lies with the Charterers/Receivers* provided Owners 178
have complied with the maximum draft limitations in lines 173/174. 179

25. It is understood that if this vessel is fitted with our decks, container fittings and/or any other special fittings not connected with the carriage of grain in bulk, any extra expenses incurred in loading 180
and/or discharging as a result of the presence of such our decks, container fittings and/or special fittings are to be for Owners' account. Time so lost shall not count as laytime or time on demurrage. 181

26. 182
183
184

27. All St. Lawrence Seaway and/or Welland Canal tolls on vessel and/or cargo assessed by Canadian and United States Authorities are to be paid and borne by Owners. 185

* Delete as appropriate.

Page 8

ORIGINAL

28. Any time lost on account of vessel's non-compliance with Government and/or State and/or Provincial regulations pertaining to water pollution shall not count as laytime or time on demurrage. 186

187

29. Owners'*/Charterers* are to appoint agents at loading port(s) and Owners'*/Charterers* are to appoint agents at discharging port(s). **as nominated by charterers.** 188

In all instances agency fees shall be for Owners' account but are not to exceed customary applicable fees. **(see clause 78)** 188

30. If the cargo cannot be loaded by reason of Riots, Civil Commotions or of a Strike or Lock-out of any class of workmen essential to the loading of the cargo, or by reason of obstructions or stoppages 189
beyond the control of the Charterers caused by Riots, Civil Commotions or a Strike or Lock-out on the Railways or in the Docks or other loading places, or if the cargo cannot be discharged by reason 190
of Riots, Civil Commotions, or of a Strike or Lock-out of any class of workmen essential to the discharge, the time for loading or discharging, as the case may be, shall not count during the continuance 191
of such causes, provided that a Strike or Lock-out of Shippers' and/or Receivers' men shall not prevent demurrage accruing if by the use of reasonable diligence they could have obtained other suitable 192
labour at rates current before the Strike or Lock-out. In case of any delay by reason of the before mentioned causes, no claim for damages or demurrage shall be made by the Charterers/Receivers of the 193
cargo or Owners of the vessel. For this purpose, however, at settling despatch rebate accounts, any time lost by the vessel through any of the above causes shall be counted as time used in loading, or 194
discharging, as the case may be. 195

31.    Loading Port 196
(a)    If the Vessel cannot reach the loading port by reason of ice when she is ready to proceed from her last port, or at any time during the voyage, or on her arrival, or if frost sets in after her 197
arrival, the Master for fear of the Vessel being frozen in, is at liberty to leave without cargo in such cases this Charterparty shall be null and void. 198

(b)    If during loading, the Master for fear of Vessel being frozen in, deems it advisable to leave, he has the liberty to do so with what cargo he has on board and to proceed to any other port with 199
option of completing cargo for Owners' own account to any port or ports including the port of discharge. Any part cargo thus loaded under this Charterparty to be forwarded to destination at Vessel's 200
expense against payment of the agreed freight, provided that no extra expenses be thereby caused to the Consignees, freight being paid on quantity delivered (in proportion if lump-sum), all other 201
conditions as per Charterparty. 202

(c)    In case of more than one loading port, and if one or more of the ports are closed by ice, the Master or Owners to be at liberty either to load the part cargo at the open port and fill up elsewhere 203
for the Owners' own account or under sub-clause (b) or to declare the Charterparty null and void unless the Charterers agree to load full cargo at the open port. 204

Voyage and Discharging Port
(d)    Should ice prevent the Vessel from reaching the port of discharge, the Charterers/Receivers shall have the option of keeping the Vessel waiting until the re-opening of navigation and paying 205
demurrage or of ordering the vessel to a safe and immediately accessible port where she can safely discharge without risk of detention by ice. Such orders to be given within 48 hours after the Owners 206
or Master have given notice to the Charterers/Receivers of impossibility of reaching port of destination. 207

(e)    If during discharging, the Master for fear of Vessel being frozen in, deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to the nearest safe 208
and accessible port. Such port to be nominated by Charterers/Receivers as soon as possible, but not later than 24 running hours, Sundays and holidays excluded, of receipt of Owners' request for 209
nomination of a substitute discharging port, failing which the Master will himself choose such port. 210

211

* Delete as appropriate.

ORIGINAL

(f)     On delivery of the cargo at such port, all conditions of the Bill of Lading shall apply and the Owners shall receive the same freight as if the Vessel had discharged at the original port of 212
destination, except that if the distance to the substitute port exceeds 100 nautical miles the freight on the cargo delivered at their port to be increased in proportion.     213

**New Jason Clause** 32. Any extra insurance on cargo incurred owing to vessel's age, class, flag or ownership to be for Owners' account up to a maximum of and may be deducted from the     214
**Insurance** freight, in Charterer's option. The Charterers shall furnish evidence of payment supporting such deduction. **(see clause 83)**     215

**Liberty** 33. The vessel shall have the liberty as part of the contract voyage to proceed to any port or ports at which bunker oil is available for the purpose of bunkering at any stage of the voyage whatsoever     216
**Bunker** and whether such ports are on or off the direct and/or customary route or routes between any of the ports of loading or discharge named in this Charterparty and may there take oil bunkers in any quantity     217
**Clause** in the discretion of Owners even to the full capacity of bunker tanks and deep tanks and any other compartment in which oil can be carried whether such amount is or is not required for the chartered     218
voyage. **The vessel not to deviate from the contractual route except for bunker purposes.**     219

**Deviation** 34. Any deviation in saving or attempting to save life or property at sea or any reasonable deviation shall not be deemed to be an infringement or breach of this Charterparty and the Owners shall not     220
be liable for any loss or damage resulting therefrom, provided, however, that if the deviation is for the purpose of loading or unloading cargo or passengers it shall, prima facie, be regarded as unreasonable.     221

**Lien and** 35. The Owners shall have a lien on the cargo for freight, deadfreight, demurrage, and average contribution due to them under this Charterparty.     222
**Cesser Clause**

**Cesser Clause** Charterers' liability under this Charterparty is to cease on cargo being shipped except for payment of freight, deadfreight, demurrage at loading, and except for all other matters provided for in this     223
Charterparty where the Charterers' responsibility is specified.     224

**Exceptions** 36. Owners shall be bound before and at the beginning of the voyage to exercise due diligence to make the vessel seaworthy and to have her properly manned, equipped and supplied and neither the     225
vessel nor the Master or Owners shall be or shall be held liable for any loss of or damage or delay to the cargo for causes excepted by the U.S. Carriage of Goods by Sea Act, 1936 or the Canadian     226
Carriage of Goods by Water Act, 1970, or any statutory re-enactment thereof.     227

And neither the vessel, her Master or Owners, nor the Charterers or Receivers shall, unless otherwise in this Charterparty expressly provided, be responsible for loss of or damage or delay to or failure     228
to supply, load, discharge or deliver the cargo arising or resulting from: - Act of God, act of war, act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; seizure     229
under legal process, provided bond is promptly furnished to release the vessel or cargo; floods; fires; blockades; riots; insurrections; Civil Commotions; earthquakes; explosions. No exception afforded     230
the Charterers or Receivers under this clause shall relieve the Charterers or Receivers of their obligations for payment of any sums due to the Owners under provisions of this Charterparty.     231

**Clause** 37. If the vessel loads in the U.S.A. the U.S.A. Clause Paramount shall be incorporated in all Bills of Lading and shall read as follows:     232
**Paramount**

"This Bill of Lading, shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, or any statutory re-enactment thereof, which shall     233
be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities     234
under said Act. If any term of this Bill of Lading be repugnant to said Act to any extent, such terms shall be void to that extent but no further."     235

**If the cargo is the property of the charterers the owners shall have the same responsibility as they would have under the clause had the cargo been the property**
**of a third party and carried under bill of lading incorporating the Hague rules.**

* Delete as appropriate.

ORIGINAL

38. If the vessel loads in Canada the Canadian Clause Paramount shall be incorporated in all Bills of Lading and shall read as follows:

~~"This Bill of Lading so far as it relates to the carriage of goods by water shall have effect subject to the provisions of the Carriage of Goods by Water Act, 1936, Revised Statutes of Canada, Chapter C-15, enacted by the Parliament of the Dominion of Canada or any statutory re-enactment thereof, which shall be deemed to be incorporated herein nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the said Act. If any term of this Bill of Lading be repugnant to said Act to any extent such term shall be void to that extent but no further."~~

39. If the liability for any collision in which the vessel is involved while performing this Charterparty falls to be determined in accordance with the laws of the United States of America, the following clauses shall apply:

"If the vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the vessel, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the owners of the said goods, paid or payable by the other or non-carrying vessel or her owners to the owners of the said goods and set off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying vessel or Carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect to a collision or contact."

---

The Charterers shall procure that all Bills of Lading issued under this Charterparty shall contain the same clause.

40. General Average shall be adjusted according to the York/Antwerp Rules 1974 and shall be settled in ~~London~~ United Kingdom

Where the adjustment is made in accordance with the law and practice of the ~~United States of America~~ the following clause shall apply:

"In the event of accident, danger, damage or disaster before or after commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for the consequences of which, the Carrier is not responsible, by Statute, contract or otherwise, the goods, shippers, consignees or owners of the goods shall contribute with the Carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving vessel is owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the Carrier before delivery."

The Charterers shall procure that all Bills of Lading issued under this Charterparty shall contain the same clause.

41.   1.   The Master shall not be required or bound to sign Bills of Lading for any blockaded port or for any port which the Master or Owners in his or their discretion consider dangerous or impossible

*Delete as appropriate.

ORIGINAL

to enter or reach.

2.  (A)  If any port of loading or of discharge named in this Charterparty or to which the vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or

(B)  if owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions, or the operation of international law (a) entry to any such port of loading or of discharge
or the loading or discharge of cargo at any such port be considered by the Master or Owners in his or their discretion (b) it is considered by the Master or Owners in his or their discretion
dangerous or impossible for the vessel to reach any such port of loading or of discharge - the Charterers shall have the right to order the cargo or such part of it as may be effected to be loaded or
discharged at any other safe port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of the Charterparty (provided such other port
is not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the Master's or Owners' discretion dangerous or prohibited). If in respect of a port of discharge no orders be
received from the Charterers within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port, then the Owners shall then be at liberty to discharge
the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charterparty or not)
and such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment so far as cargo so discharged is concerned. In the event of the cargo being loaded or discharged at
any such other port within the respective range of loading or discharging ports established under the provisions of the Charterparty, the Charterparty shall be read in respect of the freight and all other
conditions whatsoever as if the voyage performed were that originally designated. In the event, however, that the vessel discharges the cargo at a port outside the range of discharging ports established
under the provisions of the Charterparty, freight shall be paid as for the voyage originally designated. In this latter event the Owners shall have a lien on the cargo for all such extra expenses
thereat shall be paid by the Charterers or Cargo Owners.

3.  The vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other
wise whatsoever given by the government of the nation under whose flag the vessel sails or any other government or local authority including any de facto government or local authority or by any
person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the vessel
the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations, anything is done or is not done such shall not be deemed a
deviation.

If by reason of or in compliance with any such directions or recommendations the vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered
pursuant to the terms of the Bills of Lading, the vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such
discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally
designated or to which the vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port of discharge
shall be paid by the Charterers and/or Cargo Owners and the Owners shall have a lien on the cargo for freight and all such expenses **vessel's hull and machinery war risk cover basic war risk.**

42.  An address commission of   **2.5**   % on gross freight, deadfreight and demurrage is due to Charterers at time freight and/or demurrage is paid,
vessel lost or not lost, Charterers having the right to deduct such commission from payment of freight and/or demurrage.

43.  A brokerage commission of   **1.5**   % on gross freight, deadfreight, and demurrage is payable by Owners to **Ldens hellas + Olympus enterprises (Egypt) which to be shared equally.**
at time of receiving freight payment and/or demurrage payments(s), vessel lost or not lost.

\* Delete as appropriate.

**insurance as well as an additional war risk insurance premium for trading to Egypt which require additional war risk insurance always to be for owner's account crew and officers war risk bounds, if any, always to be for owner's account**

less Commission

okerage Commission

# EXHIBIT 2



INVOICE NO. 09/14/07/2008
### TO:SAMSUN LOGIX HELLAS LTD
### 11 NAFSIKAS ROAD VOULA GREECE 16673

| M.V. IOANNA P | |
|---|---|
| **Carrying Charges due** | |
| 9718.00 tons x $0.5 x 6 Days =   $ 29154.0 | |
| 21945.00 tons x $0.5 x 7 Days =  $ 76807.5 | |
| 16104.00 tons x $0.5 x 8 Days =  $ 64416.0 | |
| 7602.00 tons x $0.5 x 9 Days =   $ 34209.0 | |
| 2113.963 tons x $0.5 x 10 Days = $ 10569.8 | |
| Carrying charges | $ 215156.30 |
| PLUS | |
| Interests: | |
| 57482.963 mts X $ 424.25 / 360 Days X 10days X 5.46% | $ 36987.17 |
| **Total due to Charterers :** | $ 252143.47 |
| Two hundred fifty two thousand and one hundred forty three | |
| United States Dollars and forty seven Cents | |
| Please remit a/m amount into the following bank account : | |
| JPMORGAN CHASE BANK, NEW YORK<br>TO:<br>NATIONAL BANK OF EGYPT, ACCOUNT NO. 544712954<br>BENEFICIARY:<br>NATIONAL BANK OF EGYPT-MAIN BRANCH<br>24TH SHEREEF ST., CAIRO – EGYPT<br>IN FAVOR OF:<br>VENUS INTERNATIONAL FREE ZONE<br>ACCOUNT NO. 21005534591 | |

CHARTERING AGREEMENT



# EXHIBIT 3

**Samsun Logix Hellas Ltd.**
11 Nafsikas, Voula 166 73 Athens, Greece
Tel.30-210-9689131 Fax.30-210-9889217



We refer to our recent correspondence.

As Charterers(Venus international free zone) are aware the freight was remitted to us(Samsun logix hellas ltd) less USD 552,025.36 against Charterers invoice no. 09/14/07/2008, 04/01/07/2008 and 05/01/07/2008 in respect of deductions allegedly due to Charterers under clause 83 and 73 of the governing charter party . As Charterers are further aware, we resist these deductions, however despite requests Charterers have wrongfully and in breach of their obligations failed to pay the outstanding freight.

In the circumstances we have no choice but to give Charterers notice that they intend to lien the cargo laden on board MV "IOANNA P" and MV "KONAVLE" prior to discharge in accordance with their rights under clause 35 of the charter party in relation to all claims arising under the charter party including, but not limited to, we claim for the balance of freight in the amount of USD 552,025.36.

We reserve our rights in full.

For and on behalf of

Samsun logix hellas ltd

T.K KIM / DIRECTOR OF SAMSUN LOGIX HELLAS LTD

# EXHIBIT 4



## INVOICE NO. 04/01/07/2008

### TO:SAMSUN LOGIX HELLAS LTD
### 11 NAFSIKAS ROAD VOULA GREECE 16673

| M.V. IOANNA P | | | |
|---|---|---|---|
| Over age Premium due | | | |
| 57482.963 tons x $424.25 x 110% x 0.56% | | | $ 150224.83 |
| One Hundred and fifty Thousand and two | | | |
| Hundred and twenty four United States Dollars | | | |
| and eighty three Cents | | | |
| Please remit a/m amount into the following bank account : | | | |
| JPMORGAN CHASE BANK, NEW YORK | | | |
| TO: | | | |
| NATIONAL BANK OF EGYPT, ACCOUNT NO. | | | |
| 544712954 | | | |
| BENEFICIARY: | | | |
| NATIONAL BANK OF EGYPT-MAIN BRANCH | | | |
| 24TH SHEREEF ST., CAIRO – EGYPT | | | |
| IN FAVOR OF: | | | |
| VENUS INTERNATIONAL FREE ZONE | | | |
| ACCOUNT NO. 21005534591 | | | |



CHARTERING DEPARTMENT

# EXHIBIT 5



## INVOICE NO. 05/01/07/2008

### TO:SAMSUN LOGIX HELLAS LTD
### 11 NAFSIKAS ROAD VOULA GREECE 16673

| <u>M.V. Konavle</u> | | | |
|---|---|---|---|
| <u>Over age Premium due</u><br>65034.355 tons x $418.40 x 110% x 0.5%<br>**One Hundred Forty Nine Thousand  Six Hundred**<br>**Fifty Seven  United States Dollars and Six Cents**<br>Please remit a/m amount into the following bank account :<br><br>JPMORGAN CHASE BANK, NEW YORK<br>TO:<br>NATIONAL BANK OF EGYPT, ACCOUNT NO.<br>544712954<br>BENEFICIARY:<br>NATIONAL BANK OF EGYPT-MAIN BRANCH<br>24TH SHEREEF ST., CAIRO – EGYPT<br>IN FAVOR OF:<br>VENUS INTERNATIONAL FREE ZONE<br>ACCOUNT NO. 21005534591 | | | $ 149657.06 |

CHARTERING MANAGEMENT

